IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARRYL R. DUNCAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 15–cv–087–MJR–SCW |
| | ) |
| THOMAS SPILLER, | ) |
| JEFF MILLER, | ) |
| ERIC WANGLER, | ) |
| DONALD WANACK, | ) |
| JARROD SELBY, | ) |
| MICHAEL OBERTINI, and | ) |
| JOHN WOLFE | ) |
| | ) |
| Defendants. | |

# REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

Pursuant to 42 U.S.C. § 1983, *pro se* Plaintiff Darryl Duncan has sued multiple defendants on multiple claims based on events that happened while Plaintiff was incarcerated at Pickneyville Correctional Center. (Doc. 1). After threshold review, the Court found that Plaintiff had stated six claims: 1) Defendant Miller used excessive force against Plaintiff on August 2, September 29, and October 29, 2014 in violation of the Eighth Amendment: 2) Wangler and Wanack used excessive force against Plaintiff on September 29 and October 21, 2014; 3) Selby and Obertini used excessive force against Plaintiff on December 2 and 16th, 2015 in violation of the Eighth Amendment; 4) Defendant Wolfe used excessive force against Plaintiff on January 8, 2015 in violation of the Eight Amendment; 5) Defendant Spiller instituted a policy, custom or practice of using excessive force when he directed Pickneyville staff to "hold [Plaintiff] and shut [him] up in violation of the Eighth Amendment; 6) Defendants Spiller, Miller, Wangler, Wanack, Selby, Obertini, and Wolfe participated in a conspiracy to retaliate against Plaintiff through the use of excessive force. (Doc. 4).

1

The Court also found that these allegations that Plaintiff was subjected to on-going assaults by prison guards at Pickneyville based on a conspiracy to retaliate against him were sufficient to satisfy the "imminent danger" standard, and allowed Plaintiff to proceed in forma pauperis (IFP) despite the fact that he has previously been assessed three strikes under § 1915A. (Doc. 4, p. 5). On September 1, 2015, Defendants filed a motion seeking to revoke Plaintiff's IFP status. (Doc. 99). Pursuant to 28 U.S.C. 636(b)(1)(B) the undersigned held an evidentiary hearing on Defendants' motion on October 7, 2015. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's IFP status be **REVOKED** and that Plaintiff be ordered to pay the full filing fee within a reasonable amount of time. The undersigned further **RECOMMENDS** that Plaintiff's Motions for Preliminary Injunctions be **DENIED**. (Doc. 108) (Doc. 109) (Doc. 116).

## Procedural Background

Plaintiff filed his Complaint on January 28, 2015. (Doc. 1). Contemporaneously, Plaintiff also filed a Motion for Leave to Proceed IFP. (Doc. 2). On February 3, 2015, the Court screened the case pursuant to § 1915A, and took up Plaintiff's IFP motion at that time. (Doc. 4). The Court noted that Plaintiff has had at least three cases dismissed as frivolous or for failure to state a claim upon which relief may be granted: *Duncan v. Walker*, No. 08-cv-315-JPG (S.D. Ill. dismissed Mar. 11, 2009); *Duncan v. Quinn*, No. 10-cv-3124-HAB (C.D. Ill. dismissed June 7, 2010); and *Duncan v. Quinn*, No. 14-cv-604-JPG (S.D. Ill. dismissed June 4, 2010). (Doc. 4). Plaintiff could therefore not proceed IFP unless he showed that he is in imminent danger. The Court noted that Plaintiff had previously attempted to bring some of these claims in Case No. 14-1167, but found that Plaintiff had now pled that the assaults were ongoing and part of conspiracy, and therefore sufficient to meet the "imminent danger" threshold. (Doc. 4). Summons issued to the Defendants on February 4, 2015, (Doc. 6) and they filed an Answer on April 2, 2015. (Doc. 26). None of the Defendants filed

a response to Plaintiff's Motion for IFP status, and none of them had been served with the Complaint at that time.

Plaintiff filed numerous motions seeking injunctive relief in this case, and the undersigned held a hearing on them on March 12, 2015. (Doc. 40). During the hearing, counsel for Defendant indicated that he had not yet spoken to the Defendants regarding the allegations in this case. (Doc. 40). The Defendants were subsequently ordered to file a supplemental response to Plaintiff's request for injunctive relief. (Doc. 45). Plaintiff continued to file motions requesting injunctive relief during this time. After Defendants filed their supplement, (Doc. 50), the Court set another hearing to address new evidence raised by Defendants. (Doc. 56). However, before that hearing could be held, Plaintiff contacted the Court and reported that he had been released from prison. (Doc. 65). The Court then cancelled the hearing and found Plaintiff's requests for injunctive relief moot as Plaintiff was no longer in the custody of the Defendants. (Doc. 68).

IDOC revoked Plaintiff's parole on June 30, 2015, and he is currently incarcerated at Dixon Correctional Center. (Doc. 82). On August 17, 2015, Plaintiff filed a Motion seeking leave to amend his Complaint to add claims that his most recent parole revocation violated his constitutional rights. (Doc. 90). Plaintiff's proposed amended complaint seeks to add parole agents involved in the decision to revoke Plaintiff on June 30, 2015. (Doc. 90).

On September 1, 2015, Defendants filed the present Motion to Revoke Plaintiff's IFP status. (Doc. 99). Plaintiff filed a Response on September 15, 2015. (Doc. 104). The Court held a hearing on this Motion on October 7, 2015. (Doc. 110). Both sides stated that they intended to rely primarily on the evidence presented at the prior hearing on Plaintiff's requests for injunctive relief and in the Response filed to Plaintiff's requests for injunctive relief. (Doc. 50). They did not present further evidence.

Plaintiff has also filed three motions seeking an emergency preliminary injunction. Plaintiff filed the first injunctive relief motion on September 28, 2015. (Doc. 108). In that Motion, Plaintiff alleges that he has not received proper eyeglasses, that his bottom partial dentures are broken and inadequate, that he has athlete's foot as a result of being issued used boots, and that he needs paper, pen, and pre-paid envelops to use for his non-legal personal and business uses. (Doc. 108). Plaintiff also states that, as shown by the above requests, he is still in danger of imminent harm. (Doc. 108).

One week later on October 5, 2015, Plaintiff filed another request for injunctive relief. (Doc. 109). This motion seeks to compel IDOC employees, who are not defendants here, to release Plaintiff and give him a parole plan. (Doc. 109). Plaintiff filed a third motion seeking injunctive relief on October 19, 2015. (Doc. 116). This Motion addresses Plaintiff's interactions with various correctional counselors at Dixon, none of whom are Defendants here. (Doc. 116).

Plaintiff also filed a "supplement" to his response to the motion to revoke on October 26, 2015. (Doc. 121). The supplement refers to and incorporates Plaintiff's motions for injunctive relief and repeats the claim that he is still in imminent danger. (Doc. 121).

**Factual Background**

Plaintiff's Complaint alleges that Miller assaulted him on August 2, 2014, when he denied Plaintiff the use of his cane, and then grabbed Plaintiff and dragged him, breaking his left wrist and causing nerve damage. (Doc. 1, p. 1). Plaintiff testified regarding this event at the hearing on March 12, 2015. (Doc. 40). He testified that sometime in July or August, approximately a month after he arrived at Pickneyville, he was told to pack his stuff up to be transferred. (Doc. 40, p. 59). Plaintiff further alleged that he was told to cuff up and he complied. (Doc. 40, p. 59). He then requested his cane and an officer stated that he would bring it for him. (Doc. 40, p. 59). Then Miller grabbed Plaintiff by the handcuffs and said, "I don't care nothing about you with the cane." (Doc. 40, p. 60). At that point in his testimony, Plaintiff specifically informed the undersigned that

4

he was "not reading any of this from a paper. This actually happened." (Doc. 40, p. 60). Plaintiff then testified that Miller told him, "I'm not giving you anything. You are moving right across the hall. You are right across this gallery, and we are not going to give you no cane, and yada yada, and then said a few cuss words." (Doc. 40, p. 60). Miller then allegedly grabbed Plaintiff's wrist and started pulling, causing swelling and a knot to form. (Doc. 40, p. 60). Plaintiff alleges that health care refused to document this knot until September 1, 2014. (Doc. 40, p. 60). The doctor then prescribed him an x-ray and physical therapy in November due to his wrist. (Doc. 40, p. 60). Miller denies assaulting Plaintiff at any time. (Doc. 50-1, p.1). He also submitted an affidavit stating that because August 2, 2014 fell on a Saturday, that he was not working at Pickneyville on that day. (Doc. 50-1, p. 1). Miller also submitted his time sheet, which lists Saturdays and Sundays as his days off, and shows that he was off on August 2, 2014. (Doc. 50-1, p. 3).

  Plaintiff refused sick call on August 5, 2014, although a subsequent note indicates that Plaintiff was seen for a bump on his baby toe on that date. (Doc. 12-3, p. 22). The bump is described as a firm area the size of a dime with no open areas, redness, or drainage. (Doc. 12-3, p. 22). On September 2, 2014, Plaintiff complained of pain and a small knot in his left wrist. (Doc. 12-3, p. 25). Plaintiff reported that he had not had this pain before, and his pain was listed as a 5 on a scale of 1-10. (Doc. 12-3, p. 25). On September 6, 2014, Plaintiff complained of continuing wrist pain. (Doc. 12-3, p. 26). Plaintiff described his pain as a 3 on a 1 to 10 scale. (Doc. 12-3, p. 26). The nurse referred Plaintiff to the doctor. (Doc. 12-3, p. 26). Plaintiff saw the nurse again for his wrist pain on September 19, 2014. (Doc. 12-3, p. 33). On that day Plaintiff complained that his wrist still hurts, rated his pain as an 8, and noted that the swelling had gone down. (Doc. 12-3, p. 33). The nurse noted no swelling, bruising, or obvious signs of discomfort, but that Plaintiff reported pain with flexion in his left wrist. (Doc. 12-3, p. 33). Plaintiff reported that he had not experienced pain in his wrist before "this situation" but that he had been experiencing pain for a

month. (Doc. 12-3, p. 33). Plaintiff saw the doctor on September 23, 2014; he was then scheduled for a follow-up visit. (Doc. 12-3, p. 34). At some point, x-rays were ordered on Plaintiff's wrist. The doctor noted that Plaintiff's x-ray was negative for fractures on December 8, 2014. (Doc. 12-4, p. 13). The radiology report notes that Plaintiff's left wrist shows osteoarthritis, but no evidence of facture or dislocation. (Doc. 12-4, p. 30).

Plaintiff also repeatedly requested that the nurses on nurse sick call throughout the relevant time period document the fact that he had nerve damage, but they refused to do so, because they cannot diagnose that condition. In early 2015, Plaintiff was referred to Dan Varel, a physical therapist, to address his complaints. Varel did not think Plaintiff's symptoms indicated nerve damage and declined to send Plaintiff to an MRI. Varel also found Plaintiff uncooperative with the physical therapy process because Varel believed that Plaintiff exaggerated his pain and deliberately limited his range of motion. Varel ultimately ordered physical therapy discontinued on that ground.

Plaintiff next alleges that he was assaulted on September 29, 2014. He alleges Miller, Wangler, and Wanack handcuffed him in back and refused to give him his cane to walk with or to provide him with a wheelchair. (Doc. 1, p. 10-11) (Doc. 40, p. 62-63). He alleges that Miller and Wanack put him in a "chicken-wing" position and dragged him, causing nerve damage. (Doc. 1, p. 10-11) (Doc. 40, p. 62-63). Although Plaintiff identified Miller as participating in this incident during his testimony, he did not state that Wangler and Wanack were present. (Doc. 40, p. 62-63). Plaintiff's Complaint alleges that Wangler assisted the other two in dragging Plaintiff to his cell, while hitting him, causing bruises, swelling, nerve damage, and severe pain. (Doc. 1, p. 10).

Those are not the only allegations Plaintiff makes regarding September 29, 2014. He also alleges that he was being escorted out of segregation to 4 House when he got dizzy and fell. (Doc. 1, p. 8). Plaintiff was then taken to the health care unit. (Doc. 1, p. 8). The medical records regarding that incident were submitted by Plaintiff as an exhibit to one of his later filings. They

6

reflect that a guard reported to the nurse the Plaintiff had been walking to 4 House when he sat down on the sidewalk and refused to go any further. (Case No. 14-1167, Doc. 22-1, p. 52-54). He complained of dizziness for the first time upon reporting to health care. (Case No. 14-1167, Doc. 22-1, p. 52-54). He also stated that he hit his head and complained of back and leg pain when the health care staff attempted to assist him to seated. (Case No. 14-1167, Doc. 22-1, p. 52-54). No redness, abrasions, or swelling was noted on Plaintiff's head or anywhere else. (Case No. 14-1167, Doc. 22-1, p. 52-55). Plaintiff told the staff to bring him some water and stated that he would rather go to segregation than 4 House. (Case No. 14-1167, Doc. 22-1, p. 55). It appears that the doctor examined Plaintiff on that date as well. (Case No. 14-1167, Doc. 22-1, p. 55). Although it is unclear from Plaintiff's filings it appears that the assaults he complains of happened when the guards were escorting Plaintiff from healthcare to his housing.

Plaintiff filed several grievances and the disciplinary report regarding this incident is also in the record. Plaintiff filed a grievance dated September 30, 2014, one day after the alleged assault occurs. (Doc. 12-2, p. 5). The grievance states that on September 29, 2014, Plaintiff got dizzy and fell down on the walk, whereupon he was taken to the medical unit. (Doc. 12-2, p. 5). The grievance then goes on to complain about the medical treatment Plaintiff received there. (Doc. 12-2, p. 5). It also states that Lt. Baker came in and told the nurse Plaintiff was faking. (Doc. 12-2, p. 5). That same Lt. ordered Plaintiff taken to segregation. The grievance states that Wangler told Plaintiff that the warden is in their pocket. (Doc. 12-2, p. 5). It concludes by stating that Plaintiff was assaulted and dragged on August 2, 2014 and that on September 29, 2014, Plaintiff was threatened, and denied medical care and an ADA disability accommodation. (Doc. 12-2, p. 5). The only place Miller and Wanack are mentioned in the grievance as at the bottom where Plaintiff requests an investigation into Miller, Wanack, Wangler, Baker, Little, and "all others involved." (Doc. 12-2, p.5). The grievance does not specify what they are involved in. There is no mention of

any assault. Plaintiff does not state that he was "chicken-winged," dragged, or struck in the September 30, 2014 grievance. (Doc. 12-2, p. 5).

Wanack and Miller filed affidavits in which they state that they were called to the Health Care unit on September 29, 2014 to escort Plaintiff back to his cell. (Doc. 50-1, p. 1-4). They used an escort ring, lifted Plaintiff to his feet by his arms, after which Plaintiff walked under his own power. (Doc. 50-1, p.1-4). They were not aware of any cane Plaintiff might have used and did not drag Plaintiff. (Doc. 50-1, p. 1-4). Wangler submitted an affidavit that he did not assault and does not recall any interaction with Plaintiff on September 29, 2014. (Doc. 50-1, p. 11). Additionally, he was not assigned escort duties until November 2014 and would not have been escorting Plaintiff on September 29, 2014. (Doc. 50-1, p. 11).

Plaintiff was disciplined as a result of this incident and the adjustment committee held a hearing on October 12, 2014. (Doc. 12-2, p. 7). Plaintiff pled not guilty, and did not describe any assault that occurred as a result of this incident. (Doc. 12-2, p.7).

Plaintiff next alleges that on October 21, 2014, Wangler opened Plaintiff's cell door, and kicked him real hard. (Doc. 1, p. 11). He also alleges that Wangler told him that he had the warden in his pocket and threatened to kill Plaintiff. (Doc. 1, p. 11). The threshold order also construes this as a claim against Wanack, although Plaintiff's original complaint does not make that allegation against him, so the undersigned presumes the threshold order is in error. Although Plaintiff filed several grievances during the month of October, there does not appear to be a grievance on this issue. During the March 12, 2015 hearing, the Court invited Plaintiff to testify about the next assault he experienced after the September 29, 2015 assault, and Plaintiff responded that he was next assaulted on October 29, 2015. (Doc. 40, p. 63-64). The undersigned specifically asked about October 21, 2014, and Plaintiff had no testimony on that point. (Doc. 40, p. 64-65). Wangler

8

denies assaulting or threatening Plaintiff and does not recall interacting with him on October 21, 2014. (Doc. 50-1, p. 11).

Plaintiff alleges that Miller assaulted him again on October 29, 2014 when he pushed and elbowed him. (Doc. 1, p. 10) (Doc. 40, p.64). Miller also allegedly told Plaintiff that he would kill him or have some of his co-workers kill Plaintiff. (Doc. 1, p. 10). Plaintiff filed a grievance on this incident on the same day. (Doc. 12-2, p. 14). The grievance alleges that Miller did not say excuse me and clearly saw Plaintiff standing there before he walked by. (Doc. 12-2, p. 14). The grievance recounts past threats by Miller to kill Plaintiff, and states that Miller assaulted Plaintiff on August 2, 2014 and September 29, 2014. (Doc. 12-2, p. 14). Miller does not recall interacting with Plaintiff on October 29, 2014. (Doc. 50-1, p. 1). Plaintiff's Complaint does not state that Wanack assaulted him on October 29, 2014, but Plaintiff testified at the hearing that Wanack threatened him on October 29. (Doc. 40, p. 65). Plaintiff also filed a grievance on October 29, 2014 stating that Wanack told him not to say a word after he was pushed or that Wanack would write him a ticket for insolence. (Doc. 12-2, p. 15). The grievance also alleges that Wanack threatened to kill him. (Doc. 12-2, p. 15). Wanack denies threatening or assaulting Plaintiff on October 29, 2014. (Doc. 50-1, p. 4). There is no record that Plaintiff sought health care on October 29, 2014.

The next assault occurred on December 2, 2014. The threshold order found that Plaintiff had stated a claim against Selby and Obertini for assaults that allegedly occurred on December 2, 2014 and December 16, 2014, but it appears from the Complaint that only Selby participated in the December 2, 2014 incident. (Doc. 4) (Doc. 1). Plaintiff's testimony regarding this incident also reflects that only Selby participated in the December 2, 2014 incident. (Doc. 40, p. 66). The Complaint alleges that Selby pushed Plaintiff, which then slammed him into the wall because Plaintiff asked for an ADA shower. (Doc. 1, p. 11). Plaintiff testified that he believed this was a form of reprisal. (Doc. 40, p. 66). Selby submitted an affidavit stating that he did not assault or

9

threaten Plaintiff on December 2, 2014. (Doc. 50-1, p. 7). He did recall an incident where Plaintiff asked for an ADA shower after 10 am, despite the fact that ADA showers must be taken between 7 am and 10 am. (Doc. 50-1, p. 7). Selby verbally ordered Plaintiff into his cell, and Plaintiff complied by the third order. (Doc. 50-1, p. 7). Selby did not use physical force during this incident. (Doc. 50-1, p. 7). Plaintiff did not seek medical attention on December 2, 2014.

On December 16, 2014, Plaintiff alleges that both Selby and Obertini assaulted him by pushing him against the wall and hitting him in the face, breaking his partial dental plate. (Doc. 1, p. 11) (Doc. 40, p. 66). Selby denies assaulting the Plaintiff on this day. (Doc. 50-1, p. 7). Obertini filed an affidavit stating that he is employed as a Correctional Officer at DuQuoin Impact Incarceration Program, which operates under Pickneyville Correctional Center for the Illinois Department of Corrections. (Doc. 50-1, p. 8). While Obertini is occasionally at Pickneyville for training purposes, he does not interact with inmates during those visits. (Doc. 50-1, p. 8). Obertini was also off work on December 16, 2014. (Doc. 50-1, p. 8-9). Plaintiff did attend nurse sick call on December 16, 2014, but he complained only of generalized pain in his back, wrist, and neck, and the nurse did not document any signs of acute injury.

Plaintiff next alleges that Wolfe denied him food and medical treatment on January 8, 2015 when Wolfe put his foot on Plaintiff's arm to stop him from taking medication that he was holding in his hand. (Doc. 1, p. 17). Instead of giving Plaintiff food to take with his medication, Wolfe took Plaintiff to segregation. (Doc. 1, p. 17). Plaintiff testified that he was on his way to a meeting with Mrs. Jaimet to go over his parole plans. (Doc. 40, p. 68). Then Officer Redding accused him of entering someone else's cell, which Plaintiff denied. (Doc. 40, p. 68). Redding wrote him a ticket and sent him to segregation. (Doc. 40, p. 69). Plaintiff testified that on his way to segregation, he experienced high blood pressure, cramps, and dizziness, and that he fell out. (Doc. 40, p. 69). After he fell, the guards just left him in the shower with no clothes on and did not call medical. (Doc. 40,

10

p. 69). The guards and medical staff told others that Plaintiff refused to get up. (Doc. 40, p. 70). Plaintiff testified he had his pain medication in his hand because he was going to eat at chow before seeing Mrs. Jaimet and he had to take those pills with food. (Doc. 40, p. 79). That's when Wolfe stepped on his hand and took the pills. (Doc. 40, p. 70). Wolfe has no memory of this incident and denies assaulting Plaintiff. (Doc. 50-1, p. 10).

The medical records show that Plaintiff was seen in the health care unit on January 8, 2015, complaining of pain in his left leg and low back and cramping. (Doc. 12-4, p. 22). The nurse specifically noted that had been on his way to segregation when he alleged his legs and back started cramping. (Doc. 12-4, p. 22). Plaintiff then lay down in the segregation shower and refused to stand. (Doc. 12-4, p. 22). Plaintiff was given ibuprofen. (Doc. 12-4, p. 22). Plaintiff saw the doctor for this incident on January 9, 2015. (Doc. 12-4, p. 22).

Although the last assault identified in the Complaint occurred January 8, 2015, Plaintiff filed a motion on February 9, 2015 in which he alleged that he had been assaulted on February 5, 6, and 7th. (Doc. 10). Plaintiff alleged that he had been "hit and pushed around by those whose name [sic] appear as defendant now." (Doc. 10). Plaintiff does not describe the assaults further, and that motion continues to list many previously-dismissed defendants in its request for relief. Plaintiff initially testified that Miller, Wangler, and Wanack "hit" him on successive dates. (Doc. 40, p. 72). Plaintiff testified at the hearing that Miller hit him on February 5, 2014. (Doc. 40, p. 72). Upon cross examination, Plaintiff clarified that Miller transferred him between cells, and although he gave Plaintiff his cane, he pushed and threatened him while transferring him. (Doc. 40, p. 78). Miller denies that he hit or threatened Plaintiff on February 5, 2015 and does not recall interacting with him on that day. (Doc. 50-1, p. 1). On February 5, 2015, there is a nurse note stating that Plaintiff refused nurse sick call. The nurse documents that Plaintiff stated, "I'm sick of you fuckers treating me like this. This is fucking discrimination." Plaintiff testified that Wanack hit him on February 6,

11

2015. (Doc. 40, p. 72). Wanack submitted an affidavit and his work schedule to prove that he was not working on February 6, 2015. (Doc. 50-1, p. 4-6). Plaintiff testified that Wangler threatened him on February 7, 2015. (Doc. 40. P. 72). Wangler denies assaulting Plaintiff on that date and does not recall interacting with him at that time. (Doc. 50-1, p. 11).

## Analysis

Prisoners seeking to proceed IFP after having "struck out" may only proceed if they are in imminent danger. **28 U.S.C. § 1915(g)**. The threat or prison condition causing the imminent danger must be real and proximate. **Lewis v. Sullivan, 279 F.3d 526, 529 (7th Cir. 2002)**. It also must be imminent or occurring at the time the complaint is filed; the rule is meant to address genuine emergencies where time is pressing. **Heirmermann v. Litscher, 337 F.3d 781, 782 (7th Cir. 2003) (citing Lewis, 279 F.3d at 531)**. The Court may also deny IFP status where the allegations are conclusory or ridiculous. **Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003)**.

While an IFP determination is not the proper vehicle to evaluate the seriousness of the allegations or the merits of the underlying suit, a defendant may challenge the plaintiff's claims of imminent danger. **Taylor v. Watkins, 623 F.3d 483, 485 (7th Cir. 2010)**. A hearing is an appropriate means of resolving a conflict between the parties regarding whether a prisoner was in imminent danger at the time of filing suit. **Id**.

Plaintiff has argued that Defendants waived the right to contest his IFP status by not responding to his October 2014 Motion within 30 days. However, Defendants did not have the opportunity to file a response to that Motion because the Court addressed it prior to Defendants being served with a copy of the Complaint. Defendants cannot respond to something without a proper opportunity, and a court order disposing of a motion effectively stops any clock that might be running. Plaintiff's citations to case law are unavailing because none of the cases he cites are controlling precedent in the Seventh Circuit.

Plaintiff also makes the argument in several pleadings that he is still in imminent danger. (*See* Doc. 121). However, the standard for proceeding IFP is whether the inmate was in imminent danger at the time he filed the Complaint. Allegations that Plaintiff is currently in imminent danger, particularly where, as here, Plaintiff has been transferred to a different prison and claims that he is in imminent danger from those who are not parties to this case, are not relevant to the determination on whether Plaintiff claims of imminent danger at the time he filed the Complaint have adequate support. In any event, Plaintiff's claims that he has been denied glasses, that he is dissatisfied with his dental work, and that he has athlete's foot are not present in this case and not relevant to any determination the Court would make here. They would also likely not support a claim that Plaintiff is in imminent danger as none of those conditions put Plaintiff at risk of the type of immediate and serious harm, to which the three-strikes exception is meant to apply.

The undersigned does not find Plaintiff's claims of imminent danger credible. It is clear from the record that Plaintiff has been lying and distorting the facts at every turn. Plaintiff frequently changes his story between pleadings and testimony, and often attributes conduct to those that could not have been present.

For example, Plaintiff has long alleged, across multiple filings with this Court, that Miller broke his wrist on August 2, 2014. Plaintiff has repeatedly used the specific word "broke" or "broken," but at the hearing he testified that Miller allegedly caused a lump to form and nerve damage. Nerve damage is not the same as breaking one's wrist. "Breaking" as a medical term implies the breaking of bones. There is no evidence that Plaintiff's wrist was ever broken. In fact, a medical record that Plaintiff submitted, which has clearly been in his possession since at least February 9, 2015 shows that Plaintiff's left wrist has signs of osteoarthritis, but no signs of an acute fracture or dislocation. A December 8, 2014 doctor's note reflects that the doctor communicated this finding to Plaintiff nearly six weeks before he filed this Complaint. Yet despite being in

possession of evidence that clearly shows that Plaintiff's wrist has never been broken, Plaintiff continues to make this frivolous claim, and made it in a verified filing to this court. Plaintiff was clearly lying when he filed his Complaint.

Notably, Plaintiff also walked back from the claim that his wrist was "broken" during his March 2015 testimony and instead testified that Miller caused "nerve damage." But even assuming that "broken" and "nerve damage" are synonymous terms, which they are not, no medical personnel has ever documented nerve damage in Plaintiff's wrist. Plaintiff may hold that opinion, but he is not qualified to diagnose himself. Plaintiff's medical records reflect that Plaintiff's physical therapist did not believe that he had any symptoms of nerve damage.

Plaintiff attempts to get around this by accusing medical staff of refusing to document the wrist injury, but this is not a credible allegation either. The medical records reflect that three days after the alleged incident Plaintiff went to health care to complain about a bump on his baby toe. Plaintiff has not provided an explanation of why the health care staff would take care to document something so trivial, and yet omit a broken wrist, along with the swelling, redness, and deformity that such an injury would entail from the medical record.

But more importantly, Miller was not even at the prison on the day Plaintiff claims he broke his wrist. Plaintiff testified to an elaborate exchange of dialogue at the hearing between Miller and himself. He testified about two statements that Miller made to him about how Miller did not care that Plaintiff walked with a cane. He testified that Miller cussed at him. The undersigned can only conclude that this is an elaborate fabrication because Miller was not at work on August 2. Plaintiff also felt the need to reassure the undersigned that "this actually happened" during his testimony, something to which reliable witnesses seldom stoop. Plaintiff offered no further testimony to explain this discrepancy at the October 7, 2015 hearing, despite the fact that he received Miller's affidavit stating that he was not at work on the day Plaintiff claims he was assaulted. The

14

undersigned does not find Plaintiff's testimony regarding the events of August 2 credible because his testimony changed between the time he filed the complaint and his testimony regarding the harm he suffered, and because the evidence shows that Miller did not work on the day Plaintiff claims he assaulted him.

And Plaintiff has repeated this same pattern on at least three other occasions. Plaintiff alleges that he was assaulted again on September 29, 2014, when Miller, Wangler, and Wanack dragged him out of health care after he "fell out." Crucially, the document prepared by Plaintiff most close in time to this incident does not mention the assault at all. When Plaintiff filed a grievance on September 30, 2015, he alleged only that he was threatened, and denied medical care and an ADA disability accommodation. He did not mention any assault, and of the three guards that he has come to accuse, only one—Wangler—is mentioned in the statement of what happened. In the grievance, Wangler is only accused of telling Plaintiff that the warden is in his pocket. This could not have happened, because Wangler was not assigned escort duties until November 2014, and would not have been called to health care to escort Plaintiff to segregation. Plaintiff also puts these exact words Wangler's mouth three weeks later, suggesting that either Wangler is remarkably consistent in his threats or that Plaintiff recycles this accusation as it suits him.

Miller and Wanack are only mentioned in the grievance as guards that Plaintiff wants an investigation into; Plaintiff did not allege any of the things that he has come to say that they did in his grievance. Plaintiff also did not mention an assault at his disciplinary hearing on October 12, 2014, nor is there a medical record documenting any injury from the alleged assault. It is not until one month later in another grievance that Plaintiff describes the events of September 29 as an "assault." This suggests that Plaintiff fabricated the assault to suit his own narrative.

Plaintiff has further ascribed conduct to guards that were demonstratively not present on two other occasions. He accused Obertini of assaulting him along with Selby on December 16,

201r, but Obertini is not physically assigned to the Pickneyville prison. He also had December 16, 2014 off work. Simply put, there is no way that Obertini would have been on Plaintiff's cell block on December 16, 2014 in order to assault him. Plaintiff also alleged and testified at the hearing that Wanack hit or threatened him on February 6, 2014, but Wanack has submitted evidence that he was not at work that day. Overall, on four of the occasions that Plaintiff alleges he was assaulted, at least one of the alleged assailants was not working at the prison that day or not assigned to a task that put him in contact with Plaintiff. Plaintiff offered no testimony at the October 7, 2015 hearing to explain these discrepancies.

The larger incident discussed above are also not the only time that Plaintiff has changed his story. Plaintiff alleged in his Complaint that Wangler opened his cell door and hit him for no reason on October 21, 2014, but offered no testimony on this incident when invited to at the March 2015 hearing. Plaintiff alleged that Wolfe denied him medical treatment on January 8, 2015, but the records reflect that he was seen in health care that day. Plaintiff alleged that Miller hit him on February 5, 2015, but then stated on cross examination that Miller merely pushed and threatened him while transferring him between cells. "Pushed" and "hit" are not synonymous terms. Plaintiff also originally testified that Wangler hit him on February 9, 2015. He made this claim in his filings. But at the March hearing, he testified that Wangler merely threatened him. This kind of "rounding-up" is all over Plaintiff's allegations, and makes Plaintiff not a credible witness.

The undersigned also notes that although Plaintiff claims that he is a target of a conspiracy that threatens his very life, the medical records do not reflect that pattern of assaults that he claims occurred in this case. For example, the medical records do not reflect bruises or contusions. Plaintiff's most frequent complaint is generalized pain. On at least two occasions, Plaintiff received medical care close in time to an alleged assault, but complained of other things to medical. For instance, three days after his wrist was allegedly broken, Plaintiff reported a small bump on his toe to

16

medical and made no complaints to health care regarding his wrist. Additionally on the day Plaintiff alleges that Wolfe stepped on his arm and denied him medical care, Plaintiff saw a nurse immediately after and complained of pain in his left leg and low back, and cramping. Plaintiff also refused labs on September 30, 2015, the day after he alleges that he was "chicken winged" and punched. Plaintiff has repeatedly made the argument that he should not have had to report to health care for any reason on September 30 when he was just there the prior day. Clearly, Plaintiff did not believe that he needed medical attention on September 30.

Finally, Plaintiff's claim that there is a multi-guard conspiracy to kill him is not credible. First, although Plaintiff claims that the guards have frequently told him that they are going to kill him, the conduct he complains about is much more benign. Plaintiff alleges that the guards have pushed, hit, and kicked him. All of these incidents reflect singular contact. While the undersigned does not address the seriousness of that conduct on that motion, it is not the kind of conduct that is calculated to lead to the death of an individual. As another example, Plaintiff alleges that Miller pushed and elbowed him during an "assault," but the grievance he filed states that Miller clearly saw Plaintiff before he walked by and failed to say "excuse me," suggesting that what Plaintiff describes as an "assault" was really just the result of Miller bumping him as he walked by. Again, this does not suggest the type of premeditation necessary for a conspiracy. Plaintiff has submitted no evidence of conspiracy, nor even that the guards knew each other or communicated about him.

The threshold order in this case found that Plaintiff had stated a claim that suggested that he was in serious danger of imminent harm because Plaintiff had alleged a specific fact pattern of continuing assaults that he believed were continuing and part of a conspiracy. After taking testimony on the matter and reviewing the exhibits submitted by the parties, the undersigned finds Plaintiff's claims of imminent danger not credible. Many of Plaintiff's allegations are flat-out untrue in that he alleges that guards assaulted him on days they were not at the prison. It is also clear that

17

Plaintiff exaggerates many of these incidents for his own purposes. Many of his more serious claims, for example, that he suffers from a broken wrist, are also patently untrue. Some of his other claims appear to be incidents of prison discipline that Plaintiff disagrees with. The unsigned finds that there is no evidence that Plaintiff's life was ever at risk or that he was ever at risk for serious harm. Plaintiff has been lying to get around his status as a three-striker.

## Plaintiff's Preliminary Injunctions

Injunctions are extraordinary equitable remedies that are to be granted in civil cases only when specific criteria are clearly met by the movant. **Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).** The plaintiff must show four elements for an injunction: (1) plaintiff is likely to succeed on the merits; (2) without an injunction irreparable harm against the plaintiff is likely; (3) the harm likely to be suffered by the plaintiff would be greater than the harm the injunction would inflict on defendants; and (4) the injunction is in the public interest. **Id.** The greater the likelihood that the plaintiff will succeed on the merits of the case, the less significant the likely harm against the plaintiff must be in relation to the harm the defendant will likely suffer due to an injunction. **Id.** According to the Prison Litigation Reform Act (PLRA) injunctions in the prison context must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." **18 U.S.C.A. § 3626.** Courts may issue preliminary injunctions only on notice to the adverse party. **Fed. R. Civ. P. 65(a)(1)**.

Here, Plaintiff is seeking injunctive relief against non-parties, for events that happened after he filed the complaint. Either of those grounds would be reason enough to deny Plaintiff's request for injunctive relief as being outside of the scope of the complaint. The undersigned finds that the issues raised on the motions are not related to the claims in this case, and therefore not the proper subject for injunctive relief as Plaintiff has no chance of success on the merits. Further, any injunctive relief that Plaintiff would have based on the claims present in this case would be moot

because Plaintiff no longer resides at Pickneyville Correctional Center, and it is uncertain whether Plaintiff will be transferred back to that facility in the future. **See Murphy v. Hunt, 455 U.S. 478, 482 (1982) ("[T]here must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party) (citing Weinstein v. Bradford, 423 U.S. 147, 149 (1975))**. If Plaintiff wishes to pursue the claims raised by his Motions, he must file a new and separate complaint and pay another filing fee.

For these reasons, the undersigned **RECOMMENDS** that the District Judge **GRANT** Defendants' Motion to Revoke Plaintiff's IFP status, and impose the full filing fee on Plaintiff. The undersigned further **RECOMMENDS** that the District judge **DENY** Plaintiff's requests for injunctive relief as irrelevant and outside of the scope of the Complaint. (Doc. 108) (Doc. 109) (Doc. 116). Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. **See, e.g., Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004).** <u>Objections to this Report and Recommendation must be filed on or before November 16, 2015</u>. **See** Fed. R. Civ. P. 6(d); SDIL-LR 5.1(c).

**IT IS SO RECOMMENDED.**

DATE: <u>October 28, 2015</u>          /s/ *Stephen C. Williams*
                                                                                  **STEPHEN C. WILLIAMS**
                                                                                  United States Magistrate Judge